[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13675

_____

JAYNE SWINFORD,

                                        Plaintiff-Appellant,

*versus*

OFFICER JOSHUA SANTOS,
In his individual capacity,

OFFICER CHARLES BIDINGER,
In his individual capacity,

OFFICER ROGER OLIVER WILLIAMS, JR.,
In his individual capacity,

SERGEANT JONATHAN MCILVAN,
In his individual capacity,

CORPORAL RICHARD ALEXANDER LEDER,
In his individual capacity, et al.,

2                    Opinion of the Court                22-13675

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 3:21-cv-00090-CAR

———————————

Before BRANCH, GRANT, Circuit Judges, and CALVERT,* District
Judge.

BRANCH, Circuit Judge:

This appeal arises out of the death of Thomas Swinford. Thomas was shot and killed by Athens-Clarke County ("ACC") police officers after he refused officers' commands to drop a gun[1] and instead raised and pointed it at police officers. Thomas's widow, Jayne Swinford, filed a lawsuit in Georgia state court alleging claims under 42 U.S.C. § 1983 and Georgia's wrongful death statute against seven individual officers who shot Thomas after he raised his gun, the ACC police department's chief of police in his official and individual capacities, and the county government.

———————————

* The Honorable Victoria Calvert, United States District Judge for the Northern District of Georgia, sitting by designation.

[1] The gun was actually a BB gun, but Appellant concedes "for all purposes of this appeal that the gun Thomas Swinford held . . . reasonably appeared to be real to those on the scene."

Mrs. Swinford's complaint referenced, but did not attach, body camera footage, which she asserted supported her claims. The case was timely removed to federal court.

Defendants moved to dismiss the complaint on qualified and official immunity grounds, relying primarily on body camera footage from two officers that showed the sequence of events leading up to the shooting. The district court considered the body camera footage over Mrs. Swinford's objections and granted defendants' motion to dismiss, finding that the footage established that the officers acted reasonably in light of the circumstances they faced and thus they did not violate Thomas's constitutional rights. Accordingly, the district court also denied Mrs. Swinford's motion to amend her complaint on futility grounds. The district court subsequently denied her motion to reconsider, and she timely appealed.

On appeal, she again argues that the district court improperly considered the contents of the body camera footage as well as that the district court erred in denying her motion to amend and motion for reconsideration. We disagree. For the following reasons, we determine that the district court properly considered the body camera footage under our incorporation-by-reference doctrine and properly granted defendants' motion to dismiss. Accordingly, after careful review and with the benefit of oral argument, we affirm the district court's orders.

## I.    Background

Mrs. Swinford's initial complaint alleged the following facts, which she based in part off of body camera footage.[2]

Around 4:15 p.m., on March 8, 2019, the ACC police department received reports from Thomas's father and Mrs. Swinford that Thomas was threatening to commit suicide by police and was under the influence of drugs.  The ACC police department had responded to three prior suicide threats involving Thomas.  In response to the threat on March 8, 2019, the ACC police department dispatched units to Thomas's home in Athens, Georgia.  One of the officers who responded communicated to dispatch that Thomas had a handgun.  Accordingly, the police department established a perimeter for a "barricaded gunman" situation.

Mrs. Swinford alleged that once the officers were dealing with a barricaded gunman situation, the police department was required, per its own policy, to dispatch a Strategic Response Team ("SRT"), whose members have advanced training and special equipment to respond to situations involving mental health crises. Nevertheless, the police department did not deploy an SRT, instead it deployed regular units who created a perimeter around the residence.  At 5:55 p.m., the police department received a report that Thomas had fled in his mother's car and was outside

---

[2] Mrs. Swinford titled an entire section of her initial complaint *"Comprehensive Facts from Bodycam Videos and Reports."*

the perimeter.  Thomas returned to his parents' home shortly thereafter, and the police department, for the second time, created a perimeter around the house using non-SRT units.  The police used spike strips when creating the perimeter with the intent to disable Thomas's vehicle should he choose to flee a second time. Despite the implementation of the spike strips, at 6:02 p.m., Thomas again broke the perimeter by driving over the spike strips. He drove "approximately one-half mile to a vacant church parking lot, where he parked the disabled vehicle."

Mrs. Swinford's initial complaint described the following events immediately preceding Thomas's death:

- Police units established a perimeter around the church parking lot and took cover as they aimed firearms at Thomas.

- Police spent the next twenty minutes ordering Thomas to put down his gun as he paced near his mother's vehicle.

- Thomas informed the police he would come out if he were permitted to speak to his wife, but the police directed Mrs. Swinford not to speak to him.

- None of the police units on scene were equipped with "less lethal" weapons, such as beanbag or sponge rounds, although officers repeatedly mentioned that they needed these rounds while on scene.

- At 6:13 p.m., dispatch advised the units on scene that they may need an SRT commander, but an SRT commander was never deployed to the scene.

- At 6:25 p.m., Thomas kissed a photo of his family.

- At 6:28 p.m., Thomas walked in the direction of two police officers who had taken cover behind their patrol vehicle and raised his gun toward them.

- At the time Thomas raised his gun, the SRT was not on the scene.

- The seven officer defendants opened fire on Thomas after he raised his gun, firing a total of twenty-one shots.

- Ultimately, six shots struck Thomas—including two in the back—and Thomas died of his injuries.

- Mrs. Swinford alleged that "[a]ccording to bodycam footage" Thomas fell face down immediately after the first shots were fired, but that the officers continued to fire on Thomas after he was already on the ground with his gun out of reach.

- Mrs. Swinford alleged that all officers who fired on Thomas knew that he "had expressed the intention to commit suicide by enticing [the police] to kill him by employing lethal force."

Based on the above allegations Mrs. Swinford filed the instant lawsuit in July 2021, bringing the following three claims:

Count I—violations of the Fourth and Fourteenth Amendment under 42 U.S.C. § 1983 against the chief of police and the seven individual officers;[3] Count II—a Georgia wrongful death claim against the chief of police and the individual officers; and Count III—a claim for *Monell*[4] liability against the chief of police and the county. The defendants timely removed Mrs. Swinford's lawsuit to the U.S. District Court for the Middle District of Georgia based on federal question jurisdiction. Thereafter, they filed a motion to dismiss arguing that the individual officers were entitled to qualified immunity, both because their actions did not constitute excessive force and because the law was not clearly established at the time of Thomas's death that their actions violated the Constitution. In making this argument, they relied on body camera footage that showed the events leading up to the officers shooting Thomas as well as the moment that officers discharged their weapons. Defendants also argued that the *Monell* claims against the county and police chief should be dismissed for failure

---

[3] Mrs. Swinford's complaint names only the individual officers who shot Thomas at the church. The complaint does not allege that the chief of police was present at the perimeter or at the church where Thomas was eventually shot. Instead, her allegations against the chief pertain to comments he made at a press conference post-shooting and his alleged failure to ensure officers were equipped with less than lethal weapons.

[4] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

to state a claim and that the individual officers were entitled to official immunity on the Georgia wrongful death claim.[5]

In opposition to the motion, Mrs. Swinford argued that the district court could not consider the bodycam videos because: (1) they were not written instruments; (2) they showed only approximately three minutes of Thomas's interaction with the police whereas her complaint relied on facts gleaned from hours of video across fifteen different body cameras and thus the videos were not central to Mrs. Swinford's claims; and (3) she did not "stipulate" to the videos' authenticity. Notably, however, she did not argue that the defendants' bodycam videos were inauthentic or had been doctored in some manner, only that they were not "comprehensive" or "complete" because they showed only approximately three minutes of the interaction. She also argued that the individual officers were not entitled to qualified immunity.[6] She also did not respond to the defendants' arguments regarding the *Monell* claims against the county and the chief of police.

---

[5] Defendants also argued that Mrs. Swinford's claims were barred by Georgia's two-year statute of limitations because her claims accrued on March 8, 2019, and she did not file her complaint until July 7, 2021. That issue is not before us on appeal, and we need not reach it to resolve this case.

[6] In making this argument, she argued that the individual officers had failed to establish they were acting within their discretionary authority—a dubious position that she abandons on appeal.

More than three months after defendants filed their reply brief, Mrs. Swinford filed a motion to amend her complaint. The proposed amended complaint would have, among other things, dropped her references to body camera footage and added a claim alleging a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), against the county. Defendants opposed the request to amend the complaint, arguing that amendment would be futile because any ADA claim failed as a matter of law, and Mrs. Swinford's claims for excessive force failed for the same reasons raised in their motion to dismiss—namely that the defendants' bodycam footage proved no constitutional violation occurred, regardless of how Mrs. Swinford attempted to frame that evidence. Mrs. Swinford filed a reply brief, again arguing that the district court should not consider the videos relied on by the defendants because they "are a mere fraction of what forms the basis" of her claims, and thus the court should grant her leave to amend.

In a comprehensive order, the district court granted defendants' motion to dismiss and denied Mrs. Swinford's request to amend her complaint. The district court relied on the incorporation-by-reference doctrine to consider the body camera footage in reaching its decision. In relying on this doctrine, the district court determined that the initial—and operative—complaint directly referenced the bodycam footage at issue, including by having an entire section titled *"Comprehensive Facts from Bodycam Videos and Reports."* Next, it determined that the videos were authentic because Mrs. Swinford had disputed their completeness, not their authenticity. As to that dispute, the district

court noted that the body camera footage "depict[ed] the [i]ndividual [o]fficers' use of deadly force—the moment central to [Mrs. Swinford's] claims."

After determining it could consider the defendants' body camera footage, the district court summarized the contents. As the district court emphasized, the defendants' body camera footage tells a different story than the complaint regarding the moment that officers started shooting at Thomas. Here is what the footage shows.

For nearly three minutes prior to the shooting, Thomas can be seen pacing around his vehicle. An officer utilizing a speaker repeatedly told Thomas to put his gun down while also expressing concern for his well-being. For example, the officer told Thomas that they could get him help and that his family was concerned about him and wanted to know he was "alright." The officer instructed Thomas to "set the gun down on the hood" and to talk with him. He told Thomas to put down the gun and come to the front of his vehicle. He told Thomas that he knew there was a lot going on, but that they could work through it. He implored Thomas to "give [the police] a chance." He told Thomas that he knew that Thomas was feeling alone but that he was not alone.

Immediately after the officer told Thomas that he was not alone, Thomas started walking toward officers with his gun in hand and the officer on the loudspeaker stated, "Don't do that Thomas. Thomas do not do that. Drop the gun." Thomas lifted the gun and aimed it at some of the officers and, as a result, the officers

opened fire on Thomas.  In total, the shooting consisted of one volley of fire lasting approximately four seconds.  Thomas fell face down and raised his head after the firing had stopped, and officers shouted to Thomas to not move.  One officer asked others where Thomas's gun was, and they answered that it was right in front of him.  Officers approached Thomas, who was still lying face down, and instructed him not to move.  They then placed Thomas in handcuffs and called for medical help.  Following the shooting, one of the officers stated, "[W]e probably shouldn't have shot him."

After considering the video evidence, the district court determined that the individual officers were entitled to qualified immunity because their use of force was reasonable in light of the circumstances, namely Thomas's raising of the gun and pointing it at some of the officers, and thus they had not committed a constitutional violation.  And because the defendants' bodycam footage established that no constitutional violation occurred, the district court determined that any amendment would be futile. The district court also concluded that Mrs. Swinford had failed to state a failure-to-supervise claim against the police chief because she did not allege any facts that showed either that the chief directly participated in the alleged unconstitutional conduct or that a causal connection existed between the chief's actions and the alleged violation.  Similarly, the district court found that the complaint failed to plead facts to plausibly establish any causal connection between the county's policies or customs and the alleged constitutional violation.  As to Mrs. Swinford's proposed ADA claim in the proposed amended complaint, the district court

determined that even assuming that officers could be held liable under the ADA, she had failed to adequately allege facts to show that an ACC official acted with the required discriminatory intent or to otherwise make out a *prima facie* ADA claim. After disposing of the federal claims, the district court declined to exercise supplemental jurisdiction over the Georgia wrongful death claim and dismissed it without prejudice. The district court thereafter entered judgment in favor of the defendants.

After the district court issued its dismissal order and entered judgment against Mrs. Swinford, she moved the district court to reconsider under Federal Rule of Civil Procedure 59(e), again asserting that the district court erred in considering the defendants' body camera footage. She also argued that the district court erred in (1) considering the allegations in the complaint instead of her proposed amended complaint; (2) failing to conduct an individualized qualified immunity analysis as to each officer; (3) considering the defendants' body camera footage (which came from only two officers) rather than the body camera footage she relied upon, which came from all seven officers;[7] and (4) granting qualified immunity to the individual officers because, in her view, our decision in *Hunter v. Leeds*, 941 F.3d 1265 (11th Cir. 2019), established that the officers' shooting of Thomas violated his constitutional rights. Finally, she argued that newly discovered

---

[7] In support of this argument, Mrs. Swinford submitted all body camera footage in her possession from the March 8, 2019, shooting.

evidence—in the form of ACC policies, manuals, and agendas—supported her *Monell* claims against ACC and the police chief.

The district court denied Mrs. Swinford's motion to reconsider, determining that (1) she was largely attempting to relitigate matters already decided by presenting new arguments and new evidence (including body camera footage from other officers); (2) it would not consider her new arguments; (3) it would not consider the new evidence she submitted because she did not allege that this evidence was unavailable to her when the district court was considering the motion to dismiss; and (4) the situation in *Hunter* was factually distinct from the instant one. Mrs. Swinford timely appealed the district court's orders.[8]

## II.    Standard of Review

We review the district court's grant of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure *de novo*. *Davis v. City of Apopka*, 78 F.4th 1326, 1331 (11th Cir. 2023), *cert. denied sub nom.*, *Davis v. Apopka*, 144 S. Ct. 2528 (2024). "Although we ordinarily review district court orders denying leave to amend a complaint for abuse of discretion . . . we review such decisions *de novo* when the denial is based on a legal determination that amendment would be futile." *Taveras v. Bank of Am., N.A.*, 89 F.4th 1279, 1285 (11th Cir. 2024) (quotations omitted). "We review the

---

[8] Mrs. Swinford does not appeal the district court's decision to not exercise supplemental jurisdiction over her Georgia wrongful death claims.

denial of a Rule 59(e) motion for abuse of discretion." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1313 (11th Cir. 2023).

## III.    Discussion

Mrs. Swinford raises three primary arguments on appeal. First, she argues that the district court improperly considered the defendants' body camera footage when ruling on defendants' motion to dismiss and thus erred in finding that the individual officers had not committed a constitutional violation and were entitled to qualified immunity. Second, she argues that the district court erred in denying her motion to amend. Finally, she argues that the district court erred in denying her motion to reconsider. We address and reject each argument in turn.

### A.  Motion to Dismiss

#### 1.  The district court properly considered the defendants' body camera footage.

In general, district courts must limit their consideration to the pleadings and any exhibits attached to the pleadings when ruling on a motion to dismiss. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). If a party presents, and the court considers, evidence outside of the pleadings, the general rule requires the district court to convert the motion to dismiss into a motion for summary judgment. *See* Fed R. Civ. P. 12(d); *Finn v. Gunter*, 722 F.2d 711, 713 (11th Cir. 1984). However, there are two exceptions to the general rule: (1) the incorporation-by-reference doctrine and (2) judicial notice. *Tellabs, Inc. v. Makor Issues & Rts.,*

*Ltd.*, 551 U.S. 308, 322 (2007).  At issue here is the incorporation-by-reference doctrine.

Under the incorporation-by-reference doctrine, a district court may consider evidence attached to a motion to dismiss without converting the motion into a motion for summary judgment "if the document is (1) central to the plaintiff's claim; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024).

As to the first requirement—the centrality of the bodycam footage to Mrs. Swinford's claims—the defendants' bodycam videos clearly depict the events central to her excessive force claim—the events surrounding the individual officers shooting her husband.  The footage shows all the relevant conduct, namely officers' attempts to de-escalate the situation, Thomas ignoring the officers' instructions to put down his gun, Thomas walking toward officers while raising the gun, and the officers firing upon Thomas.  This sequence of events is what forms the basis of Mrs. Swinford's claims against the defendants.

Mrs. Swinford appears to argue that the centrality requirement is not satisfied in this case because, according to her, the incorporation-by-reference doctrine applies only to written instruments, and the defendants' bodycam videos are not written instruments.  This argument is foreclosed by our decision in *Baker v. City Madison*, where we applied the incorporation-by-reference doctrine to police bodycam footage like the footage at issue in this

case.[9]  67 F.4th 1268, 1277–78 (11th Cir. 2023); *see also Johnson*, 107 F.4th at 1298.  Mrs. Swinford attempts to distinguish *Baker* by arguing that an examination of the trial docket in *Baker* indicates that initial disclosures had already occurred in that case when the district court considered the police bodycam footage.  But we said nothing in *Baker* regarding initial disclosures, and instead held that the centrality requirement was met because—like defendants' bodycam footage in this case—the police bodycam footage in that case "show[ed] all the relevant conduct" giving rise to plaintiff's claims.  *Baker*, 67 F.4th at 1277.  Accordingly, we determine that the centrality requirement for the incorporation-by-reference doctrine is met in this case.

Turning now to the second requirement of the incorporation-by-reference doctrine—that the bodycam footage be undisputed—Mrs. Swinford argues that (1) she did not stipulate that the footage was authentic; and (2) the footage was incomplete because it showed only excerpts of the officers' body camera footage and did not include footage from every officer on the scene that day.  Both of her arguments fail.

As to her first contention, nothing in our precedent mandates that a plaintiff stipulate that a video is authentic for the district court to properly consider it.  All that is required is that its authenticity is not challenged.  *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).  She has not done so.  She did not argue below and

---

[9] In fairness to Mrs. Swinford, we issued our opinion in *Baker* after she submitted her initial brief.

has not argued on appeal that "the footage has been altered in any way," nor does she contend "that what the footage depicts differs from what actually happened." *Baker*, 67 F.4th at 1277.

As to her second contention regarding the video footage being incomplete, Mrs. Swinford relies on our decision in *Horsley*, wherein we determined that the district court could not consider transcript excerpts from a CNN broadcast attached to the defendant's motion to dismiss in a defamation case because the excerpts "did not contain the statements the complaint insist[ed] that [the defendant] made" and that "for all we kn[e]w" those statements were intentionally left out of the excerpts that the defendant selected. *Horsley*, 304 F.3d at 1135. We face a very different situation here. While the defendants' bodycam videos may be "incomplete" in the sense that they do not show every angle of Thomas's death or the hours of footage leading up to his death, they clearly show unedited footage of the event underlying Mrs. Swinford's excessive force claim. Accordingly, the district court did not err in concluding that the video footage was authentic.

Because the requirements of the incorporation-by-reference doctrine were met, the district court properly considered the defendants' body camera footage when ruling on the motion to dismiss. We now assess whether this video footage established that the officers were entitled to qualified immunity. [10]

---

[10] Mrs. Swinford also argues that the district court should have considered the allegations in her proposed amended complaint, as opposed to the allegations

### 2. The individual officers are entitled to qualified immunity.

Qualified immunity shields government employees from suit against them in their individual capacities for discretionary actions they perform in carrying out their duties. *Brooks v. Miller*, 78 F.4th 1267, 1279 (11th Cir. 2023). To determine whether qualified immunity applies, we engage in a burden-shifting analysis. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). The first step requires a defendant to show that he was acting within the scope of his discretionary authority when committing the challenged act. *Id*. "Once the defendant does that, the burden shifts to the plaintiff, who must show that qualified immunity is not appropriate" by establishing: "(1) the defendant violated a constitutional right, and (2) that constitutional right was 'clearly

---

in the initial complaint, in ruling on the motion to dismiss. Her contention is incorrect. The initial complaint was the operative complaint in this case and was the complaint that the defendants moved to dismiss. It is true that Mrs. Swinford sought the court's leave to amend her complaint and attached a proposed amended complaint. She sought the court's permission because more than twenty-one days had passed since defendants filed their motion to dismiss—indeed, more than four months had passed—and therefore she could no longer amend her complaint as a matter of course. *See* Fed R. Civ. P. 15(a)(1)(B). Thus, Mrs. Swinford's filing of a proposed amended complaint did not operate to replace her initial complaint without leave first being given by the district court. Because the district court chose to rule on the merits of defendants' motion to dismiss, it was required to consider the allegations in the initial complaint, not the proposed amended complaint. And, as discussed in more detail above, the district court subsequently ruled on her motion to amend, properly determining based on defendants' bodycam footage that no constitutional violation occurred and therefore any amendment would be futile.

established' at the time of the defendant's actions." *Brooks*, 78 F.4th at 1280 (citing *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022)). "Courts have 'discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first.'" *Id.* (alterations adopted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

Mrs. Swinford concedes on appeal that the individual officers were acting within their respective discretionary authority when they shot Thomas. Accordingly, she must establish both that the individual officers violated Thomas's constitutional rights and that the right was clearly established at the time of the officers' actions. We begin and end our qualified immunity analysis by addressing the first requirement.

The Fourth Amendment provides a "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This right "encompasses the plain right to be free from excessive force." *Lee*, 284 F.3d at 1197. Excessive force claims are judged under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395–96 (1989). "That standard requires us to ask 'whether the officer's conduct was objectively reasonable in light of the facts confronting the officer.'" *Patel v. City of Madison*, 959 F.3d 1330, 1338–39 (11th Cir. 2020) (alterations adopted) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)). Accordingly, we must "examine the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively

resisting arrest or attempting to evade arrest by flight.'" *Baker*, 67 F.4th at 1279 (alterations adopted) (quoting *Graham*, 490 U.S. at 396). "Other considerations are the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in good faith or maliciously and sadistically." *Id.* We have held that deadly force is reasonable when an officer:

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, *if feasible*.

*Hunter v. Leeds*, 941 F.3d 1265, 1279 (11th Cir. 2019) (emphasis added) (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1255 (11th Cir. 2005)).

Based on our precedent and the contents of the defendants' body camera footage, we conclude that the individual officers' use of deadly force was reasonable in light of the circumstances they faced. Once Thomas approached some of the officers and pointed his gun at them, the individual officers clearly had probable cause to believe that he posed a serious threat to the officers on scene. Accordingly, they did not use excessive force in shooting Thomas.

Mrs. Swinford makes four arguments as to why we should reach a different conclusion, none of which are convincing. First,

she argues that statements that the officers made *after* the shooting expressing regret establishes a doubt as to their probable cause. But these after-the-fact statements are irrelevant to the inquiry of whether the officers had probable cause. *Cf. Patel*, 959 F.3d at 1339 (explaining that "we must be careful not to Monday-morning quarterback" the reasonableness of an officer's use of force). As discussed above, the defendants' body camera footage clearly established that they had probable cause to believe Thomas posed a threat to the lives of the officers on the scene. Thus, her first argument fails.

Second, Mrs. Swinford argues that even assuming the officers had probable cause to believe Thomas posed a threat when he raised his gun, this probable cause dissipated once the first shot was fired because Thomas immediately began to fall. According to her version of events, the initial shot was a separate and distinct event followed by other officers firing additional shots after Thomas was already on the ground with his gun out of reach. In making this argument she relies on our decision in *Hunter*, where we determined that an officer was not entitled to qualified immunity at summary judgment for firing a second round of seven shots after his initial round of three shots caused the suspect to drop his firearm and obey the officers' commands. 941 F.3d at 1279–80.

The problem for Mrs. Swinford is the body camera footage shows an entirely different series of events than what she describes. Although Mrs. Swinford describes a separate round of fire after Thomas is already incapacitated on the ground, the footage clearly

shows that there was only one round of fire from the officers that lasted approximately four seconds in total, not two distinct rounds of fire. "[W]here a video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account and view the facts in the light depicted by the video." *Baker*, 67 F.4th at 1277–78 (internal citation omitted). Thus, the events are starkly different from Mrs. Swinford's recitation, which she makes in an attempt to bring this case within the confines of *Hunter*. Unlike the officer in *Hunter*, the officers in the instant case began firing simultaneously and ceased firing shortly thereafter. Once Thomas was on the ground, officers approached him and began administering first aid. They never opened fire a second time like the officer in *Hunter*. Accordingly, *Hunter* does not help her case.

We now turn to Mrs. Swinford's third argument. She argues that Thomas was not "warned of [the officers'] intention to use deadly force . . . as he paced outside his vehicle." But we have never held that an officer must always warn someone of his intent to use deadly force. *Davis v. Waller*, 44 F.4th 1305, 1315 (11th Cir. 2022) ("[W]e have declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such warning might easily have cost the officer his life." (quotations omitted)), *cert. denied*, 143 S. Ct. 2434 (2023). And there is no indication that the officers intended to use deadly force as their interaction began with Thomas pacing outside his vehicle. Indeed, the officers continued to instruct him to put down his firearm and told him they were

concerned for his well-being.  The officers did not use deadly force until Thomas raised his gun in their direction.  At that point it was not feasible for them to warn Thomas because they were forced to act.  Given the circumstances and the split second that officers had to decide whether to fire their weapons, we find no error in the officers' failure to verbally warn Thomas that they would open fire.[11]

Mrs. Swinford's final argument is that the district court erred in conducting the qualified immunity analysis in a collective manner rather than looking at each of the officers' individual actions as viewed from their respective vantage points.  It is true that "each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions" and thus courts "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).  Unfortunately for Mrs. Swinford, however, she invited this error by continually referring to the officers' actions collectively, rather than individually, and she failed to preserve such an argument for appeal because she did not raise it in opposing the motion to dismiss.  *F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 65 (11th Cir. 2013) ("It is a cardinal rule of

---

[11] Further supporting our conclusion on this issue is the fact that officers repeatedly instructed Thomas to drop his gun, all while having their own weapons drawn and pointed at Thomas.  It would defy common sense to believe that Thomas did not know that the officers would open fire on him if he pointed his gun at them.

appellate review that a party may not challenge as error a ruling invited by that party." (quotations and ellipses omitted)).

When Mrs. Swinford filed her complaint, she brought her excessive force claim against the officers based on their collective actions, rather than individually. Accordingly, the individual officers argued in their motion to dismiss that all of them were entitled to qualified immunity based on the contents of the body camera footage. In opposing the motion to dismiss, Mrs. Swinford never argued that the officers' actions had to be assessed on an individualized basis and instead continued to refer to the officers as a group arguing that their collective actions did not entitle them to qualified immunity.[12] The first time that she argued to the district court that the officers' actions had to be assessed individually was when she filed her motion to reconsider. The district court declined to consider this argument, and the late raising of the issue did not preserve the argument for appeal. Accordingly, we will not consider it.[13] *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957–58 (11th Cir. 2009) (refusing to consider an argument raised for the first time to the district court in a motion to reconsider).

---

[12] For example, Mrs. Swinford argued below that "ACCPD Officers shot Thomas in the absence of a threat because he had nothing but a BB gun, as opposed to ACCPD Officers who were shielded by cover" and "ACCPD shot many times after Thomas had dropped the gun out of reach and fallen on his face."

[13] Even if we were to consider such an argument, Mrs. Swinford does not explain how an individualized inquiry would have changed the outcome of the qualified immunity analysis for any of the officers.

Because we conclude that the officers did not use excessive force—and thus did not commit a constitutional violation—they are entitled to qualified immunity, and we end our qualified immunity analysis. Furthermore, because we determine that no underlying constitutional violation occurred, Thomas's supervisory liability claim against the chief of police and his *Monell* claim against the county fail as a matter of law. *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) ("[B]ecause [the officers] committed no constitutional violations, their supervisors . . . cannot be found liable . . . for violating § 1983."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (noting that the city of Los Angeles and the Police Commission could not be held liable under § 1983 if the individual officer "inflicted no constitutional injury" on the plaintiff).

## B. Motion to Amend

We now turn to Mrs. Swinford's argument that the district court erred in denying her motion to amend the complaint, which would have dropped her references to the body camera footage and added a claim alleging a violation of the ADA, 42 U.S.C. § 12112(a), against the county. Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that when, as here, a party cannot amend its complaint as a matter of course under Rule 15(a)(1), it may "amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "[A] district court may properly deny leave to amend the complaint . . . when such amendment would be futile." *Hall v. United Ins. Co. of Am.*,

367 F.3d 1255, 1262–63 (11th Cir. 2004).  Amendment would be futile when a proposed amended complaint would still be dismissed.  *Id.*

Mrs. Swinford argues in a conclusory manner on appeal that the district court erred in denying her leave to amend because (1) she filed a motion to amend her complaint before the trial court issued an order on the motion to dismiss; (2) the district court cited to the original complaint in deeming that her proposed amended complaint was futile; and (3) the district based its finding of futility on the body camera footage that defendants attached to their motion to dismiss.  Her arguments fail.  To start, as discussed in footnote 10, the district court cited to the original complaint because it was ruling on defendants' motion to dismiss and the original complaint was the operative complaint.  And in ruling on the motion to dismiss, the district court properly considered the defendants' body camera footage which established that the officers had not violated Thomas's constitutional rights.  Accordingly, the district court properly concluded that any amendment to Mrs. Swinford's claims of excessive force would be futile because the video evidence established no constitutional violation had occurred.  Thus, we find no error in the district court's futility determination.[14]

---

[14] In arguing that the district court erred in denying her leave to amend, Mrs. Swinford does not mention her proposed ADA claim.  However, she did argue in another section of her brief that the district court erred in "dismissing" this claim because it overlooked statements made by the chief of police to the effect that the police had an SRT—which was tasked with handling individuals

22-13675               Opinion of the Court                    27

### C.  *Motion to Reconsider*

Finally, Mrs. Swinford argues that the district court committed manifest error in denying her motion to reconsider. Her entire argument on this point is that the district court failed to properly apply our decision in *Hunter* to the facts of this case in ruling on the motion to dismiss.  As we explained above, however, *Hunter* is factually distinct from the instant case and does not control.  Accordingly, we find no error under our abuse of

---

suffering mental health crises—and was aware of Thomas's history of threatened suicides.  She also points to allegations in the proposed amended complaint that the chief of police was the county's designated official and policymaker.  Thus, Mrs. Swinford contends that she was entitled to an inference that the police department had a policy behind the actions that led to Thomas's death.

Setting aside the fact that the district court never dismissed Mrs. Swinford's ADA claim—because no ADA claim was in the original complaint—we find no error in the district court's determination that she failed to state a viable ADA claim in her proposed amended complaint.  The district court determined that Mrs. Swinford failed to "allege sufficient facts to support [an inference that the chief of police] had actual knowledge that ACCPD's dispatch program discriminated against mentally ill individuals in deciding whether to deploy [the SRT] or that he failed adequately to respond."  On appeal, she does not make any argument as to why this determination was incorrect.  Accordingly, she has waived any argument to this effect. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

discretion review of the district court's order denying Mrs. Swinford's motion to reconsider.

### IV.    Conclusion

For the reasons above, we conclude that the district court properly considered the body camera footage when ruling on the defendants' motion to dismiss under our incorporation-by-reference doctrine and properly granted qualified immunity to the individual officers.  Furthermore, we find no error in the district court's denial of Mrs. Swinford's request for leave to amend her complaint or its order denying her motion for reconsideration. Accordingly, we affirm the district court's orders.

**AFFIRMED**.

22-13675             Calvert, J., Concurring                 1

CALVERT, District Judge, Concurring:

During the pendency of this appeal, other panels of this Court decided *Baker v. City of Madison, Alabama*, 67 F.4th 1268, 1277 (11th Cir. 2023), which held that the incorporation-by-reference doctrine applies to police body camera footage, and *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024), which held that the incorporation-by-reference doctrine does not require the complaint to refer to the document at issue or to attach it. Under the prior panel precedent rule, this panel is bound by these rulings, and accordingly I join the majority opinion in full.[1] *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).

As a district judge who regularly handles motions to dismiss raising qualified immunity, I write separately to point out some practical issues with applying the incorporation by reference doctrine to body camera footage within the motion to dismiss framework, and offer some guidance on resolving them.

When reviewing a motion to dismiss, we are instructed to "accept[] the facts alleged in the complaint as true and draw[] all reasonable inferences therefrom in the plaintiff's favor." *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). In the case of

---

[1] If not bound by *Baker* and *Johnson*, I would have further explored Judge Brasher's cogent concerns about expanding the incorporation by reference doctrine to cover audiovisual evidence. *J.I.W. by & through T.W. v. Dorminey*, No. 21-12330, 2022 WL 17351654, at *8 (11th Cir. Dec. 1, 2022) (Brasher, J., concurring) ("I don't believe the doctrine of incorporation by reference is as simple as the parties believe it to be.").

2                    Calvert, J., Concurring              22-13675

incorporation by reference involving a document, this is straightforward. The parties can dispute what a given clause was intended to mean, but there is generally no dispute as to what the document says. In the paradigmatic example of a contract, the district court determines whether the well-pleaded allegations of the complaint constitute a breach of the incorporated contract.

But when a video is incorporated by reference, *Baker* instructs that "we accept the video's depiction instead of the complaint's account . . . and view the facts in the light depicted by the video." 67 F.4th at 1278 (citations omitted). Unlike a document, a video can depict numerous subjects moving independently at varying distances and speaking over each other at varying degrees of audibility. When there are multiple videos providing different viewpoints of the same event, the task is even more complicated.

At the motion to dismiss stage, the district court usually has only a complaint, the videos, and the parties' briefs, the latter of which by design are structured around competing narratives and theories of the case and thus do not neatly map to each other. Compare this with the more orderly summary judgment framework where the parties would have been required to organize their arguments as to the contents of the videos into discrete factual assertions, permitting the district court to engage in the more familiar process of disregarding portions of the record not cited and focusing on whether the record actually supports a given factual assertion. Fed. R. Civ. P. 56(c).

22-13675                  Calvert, J., Concurring                  3

Turning to this case, unmoored from the framework of the summary judgment process, the district court below was essentially forced to transcribe the footage and cite directly to portions of the video in formulating its opinion. To do so required some degree of editorial judgment with no opportunity for the parties to weigh in on what made the "final cut."

While motions to dismiss governed by *Baker* and *Johnson* do not require conversion to summary judgment, my read of those cases is that they do not foreclose conversion as an exercise of discretion. Exercising this discretion will often lead to a more orderly presentation of the merits and facilitate appellate review. Any concerns about subjecting a defendant to discovery prior to a ruling on the motion can be avoided by sharply narrowing the scope of discovery to those issues necessary for resolution of the converted motion under Federal Rule of Civil Procedure 26(b) and (c).