**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-13732

————————————————

G.D.M., a minor, by and through his
parents, T.E.M. and N.F.M.,

*Plaintiff-Appellant,*

*versus*

CITY OF OVIEDO, FLORIDA,
a Florida municipal corporation,
SCOTT MOSELEY, YASHIRA MONCADA

*Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:23-cv-01857-RBD-LHP

————————————————

Before ROSENBAUM, LAGOA, and MARCUS, Circuit Judges.

PER CURIAM:

This appeal arises from an incident at an elementary school, in which a nine-year-old fourth-grade student, G.D.M., who had a documented history of aggressive behavior and an active Behavior Intervention Plan, engaged in a prolonged episode of physical aggression. After school personnel's de-escalation efforts using approved protocols failed, G.D.M. threw objects at staff and officers, struck a school resource officer, kicked employees, and continued resisting. Two police officers, School Resource Officer Yashira Moncada and Officer Scott Moseley, ultimately handcuffed G.D.M. for approximately thirteen minutes until he calmed down.

G.D.M. later sued the officers for excessive force under 42 U.S.C. § 1983. The district court dismissed the claims on qualified-immunity grounds, holding that no constitutional violation occurred. After careful review and with the benefit of oral argument, we affirm.

## I.　　FACTUAL AND PROCEDURAL BACKGROUND[1]

---

[1] Because the procedural posture of this case involves a Federal Rule of Civil Procedure 12(b)(6) motion, we must accept the allegations of plaintiff's complaint as true and construe them in the light most favorable to the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012) (per curiam). The facts set forth in this section of the opinion therefore are taken from the operative complaint and the body-worn camera footage incorporated into the complaint.

G.D.M. was nine years old and enrolled as a fourth-grade student at Stenstrom Elementary School in Seminole County, Florida, at the time of the incident. He had a history of physical aggression and behavioral issues. The Seminole County Public School District recognized G.D.M. had in place both an Individual Education Plan ("IEP") and Behavior Intervention Plan ("BIP"). Under the BIP, it defined G.D.M.'s aggressive behaviors to include "hitting, kicking, pushing, throwing items and property destruction," and mandated a specific protocol to address these behaviors. Specifically, the BIP directed school personnel not to engage in any conversation with G.D.M. other than having him complete a task and to limit the level of attention directed at him during behavioral episodes. This protocol was designed to prevent escalation and to help G.D.M. regain emotional control.

On February 2, 2023, G.D.M. began exhibiting physical aggression as defined in his BIP. School personnel followed the BIP protocol by redirecting G.D.M. to the school's mailroom, using Ukeru mats—padded blocking equipment—to block his physical movements while minimizing verbal interaction with him. G.D.M. threw mail and leaflets at three school employees and cursed at them.

While G.D.M. and school personnel were in the mailroom, Officer Yashira Moncada, a police officer employed by the City of Oviedo who served as the School Resource Officer ("SRO") at Stenstrom Elementary, arrived on scene and turned on her body-

worn camera.  In response to her survey of the situation, Officer Moncada exclaimed that "this is why [she] can't be an SRO."

G.D.M. crawled toward a set of papers, grabbed a stack, and threw it at Officer Moncada as she approached him.  G.D.M. grabbed more papers, balled them up, and threw them at Officer Moncada.  G.D.M. then grabbed a stack of papers from the mailboxes and tossed those toward Officer Moncada.

One of the school employees approached G.D.M. and stood between him and the mailbox while holding an Ukeru mat.  G.D.M. balled up another piece of paper and threw it at the school employee.  G.D.M. then continued tossing more paper at Officer Moncada and around the room.

Officer Moncada approached G.D.M. and G.D.M. told her not to step on him.  G.D.M. raised his right hand and hit Officer Moncada while shouting expletives at her.  G.D.M. then threw more paper at Officer Moncada.

From where he was sitting, G.D.M. brought down a basket full of books from a low shelf.  G.D.M. picked up a book from this basket and threw it aimlessly.  Both school employees used Ukeru mats to deflect the items before one of the school employees moved the book basket. G.D.M. then began hitting the Ukeru mat.

G.D.M. began pulling on a desk leg before he was blocked by school employees. G.D.M. then grabbed one of the Ukeru mats and pulled it away from the school employee.  G.D.M. kicked the employee as she tried to block him with the mat.  G.D.M. then

grabbed the Ukeru mat held by another school employee and tried to kick her.

G.D.M. moved toward the mailboxes in the room.  He grabbed papers from the mailboxes and threw them up toward the ceiling.  G.D.M. then hit one of the school employees twice in the shin with his fists.  G.D.M. tried to hit her a third time but was blocked by a Ukeru mat being held by another school employee.

Officer Moncada walked toward the door as Officer Scott Moseley, another police officer employed by the City of Oviedo, entered the room.  When Officer Moseley came through the door, G.D.M. tossed more papers around the room and toward the Officers and school personnel.

As Officer Moncada and Officer Moseley discussed the situation, Officer Moncada advised that G.D.M. had been "throwing books at us."  G.D.M. picked up a plastic "wet floor" caution sign and threw it toward the two officers.  He then threw a book at Officer Moseley.  Officer Moseley advised Officer Moncada that he was going to handcuff G.D.M., to which Officer Moncada responded, "You can do that, I can't."

Officer Moncada was correct.  Under an agreement between the City of Oviedo (which provides the SROs) and the school board of Seminole County, SROs are explicitly prohibited from using mechanical restraints on students with disabilities below the sixth grade.  Under the agreement, handcuffs are considered "mechanical restraints."

As Officer Moseley walked toward G.D.M., G.D.M. continued to throw papers at the officer.  Officer Moseley asked G.D.M., "Can you stand up for me, bud?"  Officer Moseley was able to place the handcuffs on G.D.M. with Officer Moncada's assistance.  Someone off-camera stated, "I don't think we can do that," to which Officer Moncada responded, "He can do that since he's on the road."

G.D.M. lay on the ground and started kicking Officer Moseley's legs.  Officer Moseley had to hold G.D.M.'s left leg to stop the kicking while telling G.D.M. "chill," "stop it," and "sit up."  As Officer Moseley was attempting to sit G.D.M. up, G.D.M. yelled out, "Fuck you bitch!"  Officer Moncada told G.D.M. that if he relaxed, they could take the handcuffs off.  Officer Moseley told G.D.M. to "chill" as he sat G.D.M. upright, to which G.D.M. responded, "Get me out of these fucking handcuffs bitch!"  Officer Moseley again told G.D.M., "You need to chill."

Officer Moncada advised G.D.M. that if he stopped throwing things they could take the handcuffs off, to which G.D.M. responded, "Shut the fuck up bitch! Let me fucking go!"  G.D.M. was moving his arms in the handcuffs while going back-and-forth with Officer Moncada and yelling more expletives at her.  Officer Moncada told G.D.M. that what he was doing was dangerous, as he was hitting staff, hitting Officer Moncada, throwing things, and putting everyone in the room in danger.  Officer Moseley told G.D.M., "Stop pulling," and "Stop picking at my hands."  Officer Moncada reiterated that she was asking G.D.M. to relax so that the handcuffs could be taken off.

G.D.M. and Officer Moncada continued to speak to each other back-and-forth; G.D.M. continued to squirm and kept trying to pick at the handcuffs and get out of the handcuffs. G.D.M. continued to pull away from Officer Moseley while saying, "Ow!" and Officer Moncada told G.D.M., "If you can relax we can take the cuffs off, but you're literally endangering everybody here by hitting everybody. And they don't come to work to get beat up. They come to work to keep you safe and teach you." G.D.M. responded with more expletives before continuing to pull against the handcuffs and away from Officer Moseley. As G.D.M. tried to get the handcuffs off, Officer Moseley said to him, "You're going to hurt yourself. Stop." As she spoke with G.D.M., Officer Moncada reiterated that G.D.M. was "hitting everybody."

G.D.M. continued pulling away from Officer Moseley. Officer Moseley told G.D.M., "Quit trying to claw me. It's going to get real uncomfortable if you keep doing that. I'm not going to let you hurt me. You are not gonna hurt me." Officer Moseley told G.D.M., "Keep your nails away from me." G.D.M. said he was just trying to get the cuffs, to which Officer Moseley responded, "You keep clawing me."

G.D.M. and Officer Moncada continued speaking back-and-forth as G.D.M. kept pulling away from Officer Moseley. G.D.M. brought his legs to a kneeling position and attempted to stand up before Officer Moseley moved him and stated, "Stop trying to stand up." G.D.M. ignored Officer Moseley's instruction not to stand up and attempted to do so a second time; Officer Moseley again told

G.D.M., "Stop trying to stand up."  G.D.M. responded with, "No." Officer Moncada asked G.D.M. if they could sit him down; G.D.M. again responded with, "No."

G.D.M. was briefly placed in a sitting position before he moved and lay on the floor.  G.D.M. again fiddled with the handcuffs while speaking with Officer Moncada, Officer Moseley, and school employees.  Officer Moncada and G.D.M. had this exchange:

> Moncada: [G.D.M.], it's not okay to hit a police.
>
> G.D.M.: I don't care.
>
> Moncada: I know you don't care, but you can go to jail for things like that. And I don't wanna see you go to jail for things like that, okay? You can get in trouble for hitting staff, too.
>
> G.D.M.: I don't care, I've done it since pre-K.
>
> Moncada: That's not nice. Why do you do those things?
>
> G.D.M.: Because these fucking teachers are fucking assholes.

G.D.M. was advised several times that if he were to relax, that the handcuffs could be taken off.  School employees continued to speak with G.D.M. to calm him down.

After G.D.M. sat up and spoke calmly with school employees, Officer Moseley removed the handcuffs.  G.D.M. was restrained for approximately thirteen minutes.  After the handcuffs

were removed, G.D.M. balled his hands into a fist and began hitting himself, first hitting his body and then hitting his head. G.D.M. eventually walked out of the room with school personnel.

Based on the above allegations, G.D.M. filed this lawsuit in September 2023, bringing the following claims: Count I—excessive use of force under 42 U.S.C. § 1983 against Officer Moncada, individually; Count II—excessive use of force under 42 U.S.C. § 1983 against Officer Moseley, individually; Count III—battery/unnecessary force against City of Oviedo under state law; and Count IV—liability of City of Oviedo under § 768.28, Florida Statutes.

Among other points, the Officers moved to dismiss the § 1983 claims against them based on qualified immunity. The Officers' motion to dismiss noted that G.D.M. had referenced Officer Moncada's body-worn camera footage and requested that the district court rely on her footage in ruling on the motion. The Officers also asked the district court to consider the body-worn camera footage of Officer Moseley and requested the district court to convert the motion to dismiss into a motion for summary judgment under Federal Rule of Civil Procedure 56. The City of Oviedo filed its own motion to dismiss. G.D.M. responded in opposition to the motions to dismiss.

On April 3, 2024, the district court held a hearing on the Officers' motion. The district court declined to convert the Officers' motion to dismiss into a motion for summary judgment and stated it would deny the motions to dismiss except that it would grant

them as to Count IV. The district court remarked, however, that it may allow G.D.M. to conduct at least some discovery before any conclusive ruling as to the circumstances of the incident.

On April 9, 2024, prior to the entry of an order on the first motions to dismiss, G.D.M. filed an amended complaint. G.D.M., again, referenced only the body-worn camera footage of Officer Moncada. There were no material differences between the initial complaint and the amended complaint.

The district court entered an order on April 12, 2024, denying as moot the motions to dismiss in light of the filing of the amended complaint, and stated that, "[a]s the Court made clear at the hearing, it has not yet made a ruling on qualified immunity."

On April 19, 2024, the Officers filed a motion for clarification of the order on their motion to dismiss, as to whether the district court was denying qualified immunity outright on the pleadings, or whether the district court was denying it for discovery to proceed. While the motion for clarification was pending, the Officers moved to dismiss the amended complaint.

The district court subsequently denied as moot the motion for clarification stating that the "intent was to permit Defendants to raise qualified immunity in a motion to dismiss directed to the fresh pleading, which they have now done." G.D.M. filed a response in opposition to the Officers' motion to dismiss the amended complaint on May 3, 2025, incorporating by reference G.D.M.'s response in opposition to the first motion to dismiss filed by the Officers.

On October 16, 2024, the district court granted the Officers' motion to dismiss, and dismissed the amended complaint with prejudice, on the basis of qualified immunity. The district court entered judgment for Officer Moncada and Officer Moseley. G.D.M. timely appealed.

## II.    STANDARD OF REVIEW

We review a district court's ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) based on qualified immunity *de novo*, generally accepting the facts alleged in the complaint as true and drawing all reasonable inferences from them in the plaintiff's favor. *See Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). We employ the same *de novo* standard of review when reviewing whether a district court was required to convert a motion to dismiss into a motion for summary judgment. *See SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1336–37 (11th Cir. 2010).

## III.    DISCUSSION

G.D.M. raises two main issues on appeal. First, whether the district court erred by considering Officer Moncada's body-worn camera footage when ruling on the Officers' motion to dismiss without converting the motion to one for summary judgment. Second, whether Officers Moncada and Moseley are entitled to qualified immunity on G.D.M.'s claims of excessive force in violation of the Fourth Amendment, brought pursuant to 42 U.S.C. § 1983. We address each issue in turn.

### A. Motion to Dismiss

As a threshold matter, G.D.M. argues that the district court improperly considered Officer Moncada's body-worn camera footage without first converting the Defendants' motion to dismiss into a summary judgment motion and permitting G.D.M. to conduct limited discovery.

In general, district courts must limit their consideration to the pleadings and any exhibits attached to the pleadings when ruling on a motion to dismiss. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam). If a party presents, and the court considers, evidence outside of the pleadings, the general rule requires the district court to convert the motion to dismiss into a motion for summary judgment. *See* Fed R. Civ. P. 12(d); *Finn v. Gunter*, 722 F.2d 711, 713 (11th Cir. 1984). There are, however, two exceptions to the general rule: (1) the incorporation-by-reference doctrine and (2) judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). At issue here is the incorporation-by-reference doctrine.

Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) "the plaintiff refers to certain documents in the complaint," (2) those documents are "central to the plaintiff's claim," and (3) the documents' contents are undisputed. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (per curiam). Evidence is "undisputed" in this context if its authenticity is unchallenged. *Horsley*, 304 F.3d at 1134.

"Traditionally, we have applied the incorporation-by-reference doctrine to various types of documentary evidence." *Baker v. City of Madison*, 67 F.4th 1268, 1276–77 (11th Cir. 2023) (collecting cases). In *Baker*, we clarified that the incorporation-by-reference doctrine applies to body-worn camera footage. *Id*. at 1277; *see also Swinford v. Santos*, 121 F.4th 179, 187 (11th Cir. 2024) (affirming *Baker*'s extension of the doctrine to body-worn camera footage).

Here, the requirements of the incorporation-by-reference doctrine are easily satisfied. First, G.D.M.'s amended complaint references the body-worn camera footage of Officer Moncada: "On this video [Officer Moncada] is heard saying 'this is why I can't be an SRO.' Throughout the video, Moncada attempts to engage G.D.M. and even asks him if he wants to go to jail."

Second, the footage depicts events central to G.D.M.'s claims. It shows the relevant conduct of both G.D.M. and the Officers and is particularly helpful here because the footage is well-lit, presents both visual and audio depictions of the events, and the viewer mostly has a good angle of the events without significant visual obstruction. *See Baker*, 67 F.4th at 1277.

Third, G.D.M. has not challenged the authenticity of the footage or claimed that the "footage has been altered in any way" or "that what the footage depicts differs from what actually happened." *See Swinford*, 121 F.4th at 188.

Because the requirements of the incorporation-by-reference doctrine were met, the district court properly considered Officer

Moncada's body-worn camera footage when ruling on the motion to dismiss and did not have to convert the motion to do so.

## B. Qualified Immunity

Next, we turn to G.D.M.'s excessive force claims under § 1983. Under the Fourth Amendment of the United States Constitution, a person has a right "to be secure" from all "unreasonable . . . seizures" of his person. U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386, 395 (1989). The right to be free from unreasonable seizures "includes the right to be free from the use of excessive force in the course of an arrest." *Saunders v. Duke*, 766 F.3d 1262, 1266–67 (11th Cir. 2014).

But under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (per curiam) ("The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." (citation and quotation marks omitted)).

The initial burden is on an official claiming qualified immunity to establish that he was acting within his discretionary authority. *Marbury*, 936 F.3d at 1232. There is no dispute that Officers

Moncada and Moseley were acting within their discretionary authority as law enforcement officers during the incident. So the burden shifts to G.D.M. to establish that a reasonable jury could find that the officers violated his constitutional right, and that his right was clearly established when the officers violated it. *See id.*

### 1. *Excessive force claims under § 1983*

Excessive force claims in the context of an arrest of investigatory stop are judged under the Fourth Amendment's objective reasonableness standard. *Graham*, 490 U.S. at 395–96.[2] "That standard requires us to ask 'whether the officer's conduct was objectively reasonable in light of the facts confronting the officer.'" *Patel v. City of Madison*, 959 F.3d 1330, 1338 – 39 (11th Cir. 2020) (alterations adopted) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). We must examine the totality of circumstances, including: (1) the severity of the crime at issue, (2) whether the suspect poses

---

[2] We acknowledge that our court has articulated reasonableness standards from two cases: *Graham*, 490 U.S. at 395-96 and *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985). In *Richmond v. Badia*, we noted that "we usually review school seizures under a less exacting reasonableness standard, *Gray* [*v. Bostic*], 458 F.3d at 1304 (citing *T.L.O.*, 469 U.S. at 341–42)." *Richmond*, 47 F.4th at 1181 n.1. Importantly, *Richmond* cited *Gray* as the case that used the test from *T.L.O.* for excessive force in a school context. But we never reached the student's excessive-force claim in *Gray*. Rather, we held that the student's excessive-force claim was not an independent claim, but instead was subsumed in her illegal-seizure claim. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006). In the instant case, we need not rule definitively on which reasonableness standard governs excessive-force claims in school settings because the standard we apply will not make a difference to the outcome. So we apply the more exacting *Graham* reasonableness standard.

an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. A student's age, size, and behavioral issues may affect the reasonableness inquiry. *See e.g.*, *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1305–06 (11th Cir. 2006).

We also consider the justification for the application of force, the relationship between the justification and the amount of force used, and the extent of any injury inflicted. *Saunders*, 766 F.3d at 1267. The Fourth Amendment does not protect against the use of reasonably necessary force by law enforcement. *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (per curiam).

Even where force is not strictly necessary, it may still be lawful because it is reasonably necessary under the circumstances. *See id.* Accordingly, we routinely apply the principle of *de minimis* force to grant qualified immunity to police officers. *See Nolin v. Isbell*, 207 F.3d 1253, 1255–57 (11th Cir. 2000) ("[T]he application of *de minimis* force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."). Handcuffing alone—even if put on roughly or causing minor injuries—is a *de minimis* use of force. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1308–09 (11th Cir. 2019) (collecting cases); *see also Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) ("Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal.").

### 2. Neither Officer Moncada nor Officer Moseley violated G.D.M.'s constitutional rights.

As to Officer Moncada, G.D.M. alleges that "[Officer] Moncada's direction to have [Officer] Moseley handcuff G.D.M. and the resulting use of force toward G.D.M. was objectively unnecessary and unreasonable for Moncada to defend herself or any other person from bodily harm during the detention of G.D.M., and constitutes the excessive use of force . . . ." We disagree.

G.D.M. does not allege that Officer Moncada had any personal involvement in the alleged use of force and the body-worn camera footage shows that her sole involvement consisted of briefly assisting Officer Moseley in handcuffing G.D.M. by taking hold of G.D.M.'s left arm. That limited physical interaction does not come close to the threshold of a constitutional violation and at best constitutes a *de minimis* use of force.

As to Officer Moseley, G.D.M. alleges that "[Officer] Mosel[e]y handcuff[ed] G.D.M. and the resulting use of force toward G.D.M. was objectively unnecessary and unreasonable for Moseley to defend himself or any other person from bodily harm during the detention of G.D.M., and constitutes the excessive use of force . . . ."

Officer Moseley's brief and controlled use of force does not rise to the level of a constitutional violation. Officer Moseley's conduct in handcuffing G.D.M. and preventing further harm to G.D.M., to the school employees, and to the officers was appropriate and proportional in light of the threat posed. The body-worn

camera footage demonstrates that G.D.M. repeatedly threw objects at school personnel and officers, kicked staff attempting to deescalate the situation, and began kicking Officer Moseley during the handcuffing process. The footage also shows that the officers did not increase their use of force after G.D.M. was handcuffed.

Officer Moseley's response—securing G.D.M.'s wrists and maintaining control of his movements—was a reasonable use of *de minimis* force in a potentially dangerous environment, when viewed from the perspective of a reasonable officer on scene. The fact that the officers held onto G.D.M. and kept him in handcuffs only until he stopped exhibiting the aggressive behavior and relaxed, no longer resisting or posing a safety threat, bolsters this point. G.D.M. was able to walk away from the incident on his own and has alleged no physical injuries, further indicating that Officer Moseley used only *de minimis* force.

Furthermore, viewing the totality of the circumstances through the lens of *Graham*, the officers confronted a nine-year-old who was actively engaged in the precise behaviors his own BIP identified as dangerous—"hitting, kicking, pushing, throwing items, and property destruction"—and who had struck Officer Moncada, kicked school staff, thrown books and a caution sign at officers, and continued resisting after being told to stop. G.D.M. was not passively non-compliant and the force applied was the least intrusive means available once the school's protocols and verbal redirection had failed. This is classic *de minimis* force and we cannot

conclude that the officers' measured response was objectively unreasonable.

Because G.D.M. failed to demonstrate a violation of his constitutional rights, we need not consider the second prong of the qualified immunity analysis. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## IV.    CONCLUSION

For all these reasons, we affirm the district court's dismissal of G.D.M.'s amended complaint.

**AFFIRMED**.